The McKay Products Corporation, Petitioner, *v.* Commissioner of Internal Revenue, Respondent.

Docket No. 9846.   Promulgated December 8, 1947.

*John W. Cable, III, Esq.,* and *Wm. F. Malone, Esq.,* for the petitioner.

*Robert H. Kinderman, Esq.,* for the respondent.

OPINION.

HARLAN, *Judge*: The respondent's first contention is that the petitioner is not entitled to a bad debt deduction for the fiscal year ended July 31, 1940, of the amount of $130,607.42 because (1) the disbursement by Belle of this amount was not made for the purpose of creating a debt and did not give rise to a debt from Valley to Belle, and (2) the petitioner has failed to prove that the alleged debt became worthless in the fiscal year ended July 31, 1940.

The respondent argues that the advances were either investments by Belle in real estate made for the purpose of protecting its equity therein, or were voluntary payments by one of the obligations of another, and that in either event they did not create a debt. Cf. *Mather* v. *Commissioner*, 149 Fed. (2d) 393; certiorari denied, 326 U. S. 767. We do not agree. One of the purposes for which Valley was formed was to promote the industrial interests of Sayre and vicinity. With a view to increasing employment in this territory, it agreed to convey

to Belle the necessary land and factory buildings if it would move to Sayre and use them. It was contemplated that the land and factory buildings would be paid for by Valley out of cash subscriptions and the proceeds of pledges given by employees, and Valley, in accordance with the plan, purchased and assumed the obligation to pay for these facilities and necessary improvements thereon. The net advances of $130,607.42, here in controversy, had their inception in December 1935, when it became apparent that, because the pledges were not supplying money fast enough, Valley would have to borrow money to meet its obligations under the purchase money mortgage and for improvements. The president of Valley testified that, faced with this situation, Valley asked Belle "to make loans so that Valley Industries could meet its obligations" and that it was understood by both corporations that the advancements were loans which would be repaid. The advances were made at various times from December 1935 to February 1939, inclusive, and Valley repaid $15,000 in 1937 and $26,244.24 during the months of February to December 1939, inclusive. At the time the advances were made Belle knew that the source of Valley's income was the pledges executed by its employees, and we think it had every reason to believe that these pledges of $250 each from between 1,200 and 1,500 individuals would be adequate to permit Valley to satisfy its obligation. In the agreement of December 30, 1938, between Belle and Valley, the latter specifically admitted a debt due and owing to Belle in the amount of $85,548.66, and agreed to pay this amount and any further amounts advanced to satisfy the mortgage and other indebtedness. Belle carried the advances as an asset on balance sheets filed by it in 1937 in reorganization proceedings under section 77–B of the Bankruptcy Act, and in those proceedings the United States District Court for the Southern District of New York authorized and directed payments to be made by Belle to Valley to be used by the latter to pay a contractor for installing an electric signal system, the sum of such payments to constitute a claim against Valley by Belle. Moreover, a loan of $325,000 from the Reconstruction Finance Corporation to Belle, which was an integral part of the plan of reorganization, was conditioned upon evidence satisfactory to that corporation that Valley was obligated to repay advances made by Belle, and the loan was granted under an agreement providing that the Reconstruction Finance Corporation would receive all amounts repaid by Valley to Belle on account of such advances.

The foregoing brief summation of the evidence convinces us that the advances from Belle to Valley were made at the latter's request, that they were loans and not investments, that they were used to pay Valley's obligations, and that Valley was obligated to repay them and did repay them in part. It is our conclusion that, to the extent that these advances were not repaid, they constituted a bona fide indebted-

ness owing by Valley to Belle during the petitioner's fiscal year ended July 31, 1940.

The next question is whether the unpaid balance of the debt amounting to $130,607.42 became totally worthless during the fiscal year ended July 31, 1940, and therefore deductible. Under the agreement of December 30, 1938, between Valley and Belle, the latter was appointed by Valley as its agent and attorney in fact to receive and collect for Valley any and all moneys deducted or to be deducted from the pay of Belle's employees. Belle, acting for and on behalf of Valley, collected upon the pledges and the amounts so collected were applied against the advances it made to Valley, until the latter part of November 1939, when the Administrator of the Wage and Hour Division of the United States Department of Labor instituted an action against Belle claiming that it was violating the Fair Labor Standards Act of 1938. Belle discontinued making deductions from wages on November 29, 1939. On March 23, 1940, the court entered a decree enjoining Belle from making any deductions from the wages of its employees where such deductions would result in the employees receiving net wages less than the minimum wage. The decree of the court also provided that the minimum wage for the period from the date of the decree to October 24, 1945, was 30 cents an hour.

The respondent contends that, inasmuch as the petitioner is here claiming a deduction under the provisions of section 23 (k) of the Internal Revenue Code, as amended by section 124 (a) of the Revenue Act of 1942, which allows the deduction of bad debts which become worthless in the year claimed, it was incumbent upon it to prove that the debt became wholly worthless in the fiscal year ended July 31, 1940. He argues that it has not sustained this burden, since some part of the amount claimed as a deduction was still collectible from those employees whose salaries would be above the minimum wage after the pay roll deductions had been made, and that the real reason for discontinuing these deductions was that Belle did not wish to cause dissatisfaction among its employees, which it feared would result from continuing the deductions. He also argues that the petitioner's proof falls short of the establishment of worthlessness for the reason that there is no evidence that legal action to enforce payment against any person who had executed a subscription agreement upon which there remained an unpaid balance would not result in the satisfaction of execution on the judgment.

The petitioner's contention is that, as a result of the judgment filed in the Wage and Hour suit on March 23, 1940, Valley became insolvent, so that the debt in the remaining balance of $130,607.42 became totally worthless.

It is true, as respondent argues, that the court on March 23, 1940, did not enjoin the petitioner from making deductions from the wages of

all of its employees, and only enjoined it from making deductions in instances where they would result in employees receiving net wages less than the minimum wage. It is clear from the evidence, however, that only a small minority of petitioner's employees received salaries that were not affected by the injunction. The treasurer of Belle testified that no suit or other proceeding for the collection of any unpaid subscriptions was instituted after the injunction because "we thought it was hopeless" and because the 10 per cent deductions authorized by the employees' subscriptions would reduce the wages of "substantially all" of Belle's employees below the minimum wage. He also pointed out the impracticability of collecting from a few employees receiving a few dollars more than the minimum wage when they could not collect from others receiving the minimum wage. Taxation, as has ofttimes been said, is an eminently practical matter. "The institution of litigation where such action is not justified by hope of collection is not a prerequisite to the allowance of a deduction of a debt for worthlessness." *William Purvin*, 6 T. C. 21. Here we are convinced that, after the injunction, the possibility of collecting any substantial part of the debt by suit or otherwise was exceedingly remote, and that any attempts to collect would only have resulted in a loss of employees. As a result, Valley was left without income or assets. Under such circumstances, we think the petitioner correctly determined that the indebtedness owed to it by Valley became worthless during its taxable year ended July 31, 1940, and respondent erred in disallowing the deduction of $130,607.42 claimed by petitioner.

The next question is whether the petitioner is entitled to use the transferor's basis of the buildings and equipment in computing the amount deductible for depreciation.

In an amendment to answer filed by the respondent he alleges that, in the determination of the deficiencies in income tax for the fiscal years ended July 31, 1940, 1941, and 1942, he allowed as deductions for depreciation on buildings and equipment the respective amounts of $3,344.75, $3,610.93, and $4,178.44, calculated upon the inclusion in the depreciable base of the amount of $130,607.42, and urges that if this Court should find that the petitioner for the fiscal year ended July 31, 1940, is entitled to a deduction from gross income for a bad debt in the amount of $130,607.42, then the adjustments whereby he allowed deductions from gross income for amounts for depreciation on buildings and equipment calculated upon the inclusion in the depreciable base thereof of $130,607.42 are not correct and said amount should be eliminated from the depreciable base for each of the taxable years.

In its reply to the amendment to answer, the petitioner admits that the respondent allowed as deductions the amounts of $3,344.75, $3,610.93, and $4,178.44, calculated upon the inclusion in the depreciable

base of the amount of $130,607.42, and also admits that, if this Court should find that petitioner is entitled to a deduction from gross income for a bad debt in the amount of $130,607.42 for the fiscal year ended July 31, 1940, then that amount should not be included in the depreciable base of buildings and equipment. Petitioner contends, however, that, irrespective of the allowance or disallowance of the bad debt deduction, the amount of $292,000, the donor's basis of buildings and equipment acquired by gift, should be included in the depreciable base for each of the taxable years.

A deduction from gross income on account of depreciation is permitted by section 23 (1) of the code. Section 114 provides that the basis for depreciation shall be the adjusted basis provided in section 113 (b) for the purpose of determining gain. Section 113 (b) provides that the adjusted basis for determining gain shall be the basis determined under section 113 (a), with certain adjustments set out in section 113 (b). Section 113 (a) provides that the unadjusted basis of property shall be the cost of such property, with certain exceptions, one of which (section 113 (a) (2)) is that if property was acquired by gift after December 31, 1920, the basis shall be the same as that of the donor.

The petitioner contends that its predecessor, Belle, acquired the land and factory buildings in Sayre, Pennsylvania, by gift, and that its basis for tax purposes was the same as it had in the hands of the donor, Valley. Petitioner then points out that this property cost Valley $310,000 and that $292,000 was paid for the buildings and equipment and $18,000 for the land, so that the basis for depreciation of the buildings and equipment is $292,000.

The respondent urges that Valley did not make a gift to Belle of any interest in the buildings and equipment; that there was no donative intent in the transaction; that Valley and the residents of Sayre and vicinity expected to receive and did receive valuable benefits from Belle's performance of its part of the transaction; and that petitioner is not entitled to use cost to Valley as its basis for depreciation.

The petitioner relies upon *Helvering* v. *American Dental Co.*, 318 U. S. 322, and the respondent on *Detroit Edison Co.* v. *Commissioner*, 318 U. S. 98, and related cases.

In *Helvering* v. *American Dental Co.*, *supra*, a creditor who was selling merchandise to the taxpayer canceled interest on notes representing past due bills for merchandise, and a lessor, when a new lease was negotiated, agreed to compromise accumulated back rent. The taxpayer claimed that no taxable income was realized by it on account of these cancellations of indebtedness because they were gifts within the meaning of section 22 (b) (3). This tribunal (44 B. T. A. 425) had held that the cancellations were not gifts because "the creditors

acted for purely business reasons and did not forgive the debts for altruistic reasons or out of pure generosity." The Supreme Court said:

\* \* \* With this conclusion we cannot agree. We do not feel bound by the finding of the Board because it reached its conclusions, in our opinion, upon an application of erroneous legal standards. Section 22 (b) (3) exempts gifts. This does not leave the Tax Court of the United States free to determine at will or upon evidence and without judicial review, the tests to be applied to facts to determine whether the result is or is not a gift. *The fact that the motives leading to the cancellation were those of business or even selfish, if it be true, is not significant. The forgiveness was gratuitous, a release of something to the debtor for nothing, and sufficient to make the cancellation here gifts within the statute.* [Italics supplied.]

In *Detroit Edison Co.* v. *Commissioner, supra,* the taxpayer, a public utility engaged in the generation of electrical energy in and near Detroit, received applications for service which required an investment in extension of its facilities requiring amounts greater than the anticipated revenue to be received from the extended service. In order to obtain extension service, applicants were required to pay for the cost of construction of the extension. Under certain circumstances part of the cost paid by the customers was refunded, but the Court was concerned with only those payments which were originally, or by operation of the terms of the agreements, unrefundable and therefore permanently retained by the taxpayer. The taxpayer included such payments by customers in its surplus without taking them into income and claimed deductions for depreciation on the total cost of the extended facilities. The Commissioner eliminated from the depreciable property of the taxpayer that portion of the cost equivalent to the unrefunded and unrefundable balances of the deposits. The taxpayer contended that what it had obtained were gifts or contributions to its capital of the property paid for by its customers and that under the provisions of section 113 (a) (2) and (8) (B) of the applicable revenue laws it took the basis of the donor or transferor. In rejecting this contention, the Supreme Court said:

\* \* \* It is enough to say that it overtaxes imagination to regard the farmers and other customers who furnished these funds as makers either of donations or contributions to the Company. The transaction neither in form nor in substance bore such a semblance.

The payments were to the customer the price of the service. The receipts have gone, so far as here involved, to add to the Company's surplus. They have not been taxed as income, presumably because it has been thought to be precluded by this Court's decision in *Edwards* v. *Cuba R. Co.*, 268 U. S. 628, holding that under the circumstances of that case a government subsidy to induce railroad construction was not income. But it does not follow that the Company must be permitted to recoup through untaxed depreciation accruals on investments it has refused to make. The Commissioner was warranted in adjusting the depreciation base to represent the taxpayer's net investment. Nothing in the Regulations is to the contrary and nothing in *Helvering* v. *American Dental Co.*, 318 U. S. 322, when read in the context of its facts touches this problem at all.

We hold that the present issue is controlled by the decision of the Supreme Court in the *Detroit Edison Co.* case. Here, as in that proceeding, the taxpayer is claiming that it received a gift of property and is entitled to the donor's basis. A gift is a voluntary transfer of property without consideration. It "is a gratuity and not only does not require consideration, but there can be none. If there is consideration for the transaction, it is not a gift * * *." *Commissioner* v. *Montague*, 126 Fed. (2d) 948, 951. In the *American Dental* case the factor which the Court considered to be of paramount importance was that the "forgiveness was gratuitous, a release of something to the debtor for nothing." But we do not think it can be said in the instant proceeding that Valley either agreed to or did transfer buildings and equipment to Belle for nothing. The agreement was that Valley would make the transfer to Belle when the latter completed two acts—(1) moved to Sayre, Pennsylvania, and (2) paid out $5,000,000 in salaries. "Whether an act, or other detriment, is but a condition precedent to performance of the promise, or whether it has the quality of consideration, depends on how it was dealt with by the parties as viewed from the standpoint of a reasonable man of average intelligence and discernment." *Affiliated Enterprises* v. *Waller*, 5 Atl. (2d) 357; 1 Del. (Ter) 28. To the same effect is the following excerpt taken from Williston on Contracts (Rev. Ed.), vol. 1, sec. 112:

* * * The same thing * * * stated as the condition of a promise may or may not be consideration, according as a reasonable man would or would not understand that the performance of the condition was requested as the price or exchange for the promise. If a benevolent man says to a tramp, — "if you go around the corner to the clothing shop there, you may purchase an overcoat on my credit," no reasonable person would understand that the short walk was requested as a consideration for the promise, but that in the event of the tramp going to the shop the promisor would make him a gift. Yet the walk to the shop is in its nature capable of being consideration. It is a legal detriment to the tramp to make the walk; and the only reason why the walk is not consideration is because on a reasonable interpretation, it must be held that the walk was not requested as the price of the promise, but was merely a condition of a gratuitous promise. * * *

In the instant proceeding, Valley's promise was not gratuitous. It was organized for the purpose of improving business conditions and employment in Sayre and vicinity by getting business concerns to move to and establish themselves in that community. Its object in contacting Belle was to induce it to make such a move, and not to make a gift. A reasonable interpretation of their agreement was that the performance of the two conditions—move to Sayre and pay $5,000,000 in salaries—was the price or consideration Valley exacted for its promise to convey and for the conveyance of the land and buildings.

The fact, mentioned by petitioner on brief, that Valley received nothing which could be regarded as consideration in a money or property

sense is, we think, immaterial.   Consideration need not be a thing of pecuniary value or even reducible to a money value.   17 C. J. S. 435. "The requirement ordinarily stated for the sufficiency of consideration to support a promise is, in substance, a detriment incurred by the promisee or a benefit received by the promisor at the request of the promisor. * * * That a detriment suffered by the promisee at the promisor's request and as the price for the promise is sufficient, though the promisor is not benefited, is well settled."   Williston on Contracts (Rev. Ed.) vol. 1, sec. 102.   It "would be a detriment to the promisee, in a legal sense, if he, at the request of the promisor, and upon the strength of that promise, had performed any act which occasioned him the slightest trouble or inconvenience, and which he was not obliged to perform." *Bigelow* v. *Bigelow*, 95 Me. 17, 22; 49 Atl. 49.   Our conclusion from the foregoing is that the acts of Belle, particularly the move to Sayre, Pennsylvania, performed pursuant to and in reliance upon the promise of Valley, constituted a valuable consideration for such promise, and that, consideration being present, the conveyance of the land and buildings to Belle was not a gift.   It follows that petitioner, as Belle's successor, is not entitled to Valley's basis for the buildings and equipment for depreciation purposes and that the sum of $130,607.42, erroneously included by respondent in the depreciation base for each of the taxable years, should be eliminated.

The remaining issue is whether petitioner is entitled to include in equity invested capital the amount of $310,000 representing the basis which the land and buildings had in the hands of Valley.

The applicable provisions of the Internal Revenue Code and of the regulations are set forth in the margin.[1]

---

[1] Section 718, I. R. C., provides in part as follows:

"(a) DEFINITION.—The equity invested capital for any day of any taxable year shall be determined as of the beginning of such day and shall be the sum of the following amounts, reduced as provided in subsection (b)—

* * * * * * *

"(2) PROPERTY PAID IN.—Property (other than money) previously paid in (*regardless* of the time paid in) for stock, or as paid-in surplus, or *as a contribution to capital.* Such property shall be included in an amount equal to its basis (unadjusted) for determining loss upon sale or exchange. * * * [Italics supplied.]

* * * * * * *

"(4) EARNINGS AND PROFITS AT BEGINNING OF YEAR.—The accumulated earnings and profits as of the beginning of such taxable year ; * * *"

And section 35.718-1 of Treasury Regulations 112 provides :

"* * .* The equity invested capital for any day is determined as of the beginning of such day.   The basis or starting point is found in the amount of money and property previously paid in for stock, or as paid-in surplus, or as a contribution to capital. * * * For the purpose of determining equity invested capital, the amount of any property paid in is the unadjusted basis to the taxpayer for determining loss upon a sale or exchange under the law applicable to the taxable year for which the invested capital is being computed. * * *

* * * * * * *

"* * * If the property was acquired after December 31, 1920, by a corporation from a shareholder as paid-in surplus or from any person as a contribution to capital, then the basis shall be the same as it would be in the hands of the transferor if the transfer had not been made * * *."

Petitioner's contention that the amount of $310,000 is includible in the equity invested capital of Belle for the purpose of computing its excess profits credit on the invested capital method for each of the taxable years ended July 31, 1941 and 1942, is predicated upon its view that the transfer of the land and buildings by Valley to Belle constituted a contribution to the capital of Belle by Valley. Even if it could be assumed that the transfer of the land and buildings by Valley could qualify as a contribution to capital on the theory that no consideration which could be evaluated in terms of money passed to Valley, our decision would nevertheless be for the respondent.

In cases involving the invested capital provisions of section 207 of the Revenue Act of 1917, it was held that invested capital was confined to money or money's worth actually paid out in acquiring an interest in a business with a view to obtaining income or profits from the conduct of the business, and, therefore, the cost of property donated to a corporation by nonstockholders could not become a part of invested capital. *Frank Holton & Co.*, 10 B. T. A. 1317, and *A. C. F. Gasoline Co.*, 6 B. T. A. 1337. A similar conclusion was reached in *Liberty Mirror Works*, 3 T. C. 1018, involving the application of the provisions of section 718 of the code. In that case we held that the aggregate amount of debts forgiven by taxpayer's creditors in 1936, 1937, and 1938 and credited to surplus account in those years was not includible in the taxpayer's "equity invested capital" for 1940 and 1941 as "paid-in surplus, or as a contribution to capital." In reaching that conclusion we pointed out that the definition of invested capital in the 1917 Act was similar in all material respects to the definition of "equity invested capital" contained in section 718 of the code and applied the principle laid down in *Frank Holton & Co.*, *supra*, that the invested capital of a corporation could not be increased by donations from nonstockholders. In the instant proceeding the transfer in question was made by Valley, a nonstockholder, without any expectation of gain through an investment in the business of Belle, and no part of the value of the property transferred can be recognized as an addition to the invested capital of Belle.

Reviewed by the Court.

*Decision will be entered under Rule 50.*

TURNER, *J.*, dissenting: On the ultimate facts, it is my judgment that the item of $130,607.42 represents the investment of the petitioner in the lands and factory buildings acquired from Valley. That the advances from Belle to Valley did or did not create a debtor-creditor relationship in the first instance, is in my opinon of no moment. The transaction as it finally resulted is controlling. It is accordingly my view that, in the absence of sale. exchange, or other conversion, peti-

tioner must depend on depreciation allowances for recovery of its investment and is not entitled to a worthless debt deduction.

OPPER, *J.*, agrees with this dissent.